

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-15-00034-CV

---

JOSH AND KELLI SAVERING, CHATTANYA CHAVDA, PANNABEN NANCHA, PHILLIP AND LISA KLOTZ, PAUL ARSENEAU, ALLISON BLACKSTEIN, AND JACK A. MUHLBEIER

APPELLANTS

V.

CITY OF MANSFIELD

APPELLEE

----------

FROM THE 348TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 348-270155-14

----------

## DISSENTING OPINION ON EN BANC RECONSIDERATION

----------

I respectfully dissent from the en banc majority's opinion for the reasons set forth in the original majority opinion on rehearing, a copy of which is attached as Appendix A.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

DAUPHINOT and GARDNER, JJ., join.

DELIVERED:  September 29, 2016

**APPENDIX  A**

## 491 S.W.3d 433
Court of Appeals of Texas,
Fort Worth.

Josh and Kelli Savering, Chattanya Chavda,
Pannaben Nancha, Phillip and Lisa
Klotz, Paul Arseneau, Allison Blackstein,
and Jack A. Muhlbeier, Appellants
v.
City of Mansfield, Appellee

NO. 02–15–00034–CV
|
DELIVERED: May 26, 2016

**Synopsis**
**Background:** Residential homeowners in gated community sued their homeowners' association and city, which had built a bridge over creek to connect the property adjacent to homeowners' land to public park, seeking a declaratory judgment that association owned the property adjacent to homeowners' land and seeking to quiet title to the property, and asserting claims against city for trespass, breach of restrictive covenants, and inverse condemnation. The 348th District Court, Tarrant County, Dana M. Womack, J., denied homeowners' application for temporary injunction, and they appealed.

**Holdings:** On denial of motion for reconsideration, the Court of Appeals, Bonnie Sudderth, J., held that:

[1] trial court did not abuse its discretion by denying the homeowners a temporary injunction, preventing general public from accessing bridge, and

[2] developer's purported conveyance of property to homeowners' association was not effective, and thus homeowners did not have standing to claim that city's alleged trespass caused them a presumed injury supporting injunctive relief.

Affirmed.

Meier, J., filed dissenting opinion.

*434 FROM THE 348TH DISTRICT COURT OF TARRANT COUNTY TRIAL COURT NO. 348–270155–14

**Attorneys and Law Firms**

Bill N. Warren, for Josh and Kelli Savering, Chattanya Chavda, Pannaben Nancha, Phillip and Lisa Klotz, Paul Arseneau, Allison Blackstein, and Jack A. Muhlbeier.

Daniel R. Barrett, Tim G. Sralla, for City of Mansfield.

PANEL: GARDNER, MEIER, and SUDDERTH, JJ.

## OPINION ON REHEARING

BONNIE SUDDERTH, JUSTICE

### I. Introduction

On February 5, 2016, the appellants—Josh and Kelli Savering, Chattanya Chavda, Pannaben Nancha, Phillip and Lisa Klotz, Paul Arseneau, Allison Blackstein, and Jack A. Muhlbeier—filed a motion for panel reconsideration and a motion for reconsideration en banc of our opinion issued January 21, 2016. We deny the motion for panel reconsideration except to the extent that we correct a single quotation as pointed out by appellants in their motions, and we withdraw our opinion and judgment of January 21, 2016 and substitute the following in its place. [1]

[1]    The motion for reconsideration en banc is denied today in a separate order.

In a single issue, the appellants appeal an interlocutory order denying their amended application for a temporary injunction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (West Supp.2015). The sole issue before the court in this interlocutory appeal is whether the trial court abused its discretion by denying the appellants' amended application for temporary injunction. Because we hold that the trial court did not abuse its discretion by denying the application, we affirm.

### II. Background

The instant appeal arises from a dispute between appellee the City of Mansfield and the appellants residential homeowners in the Estates of Creekwood, a **\*435** gated community over ownership of property adjacent to the appellants' homes and to a creek. The appellants included the following demarcated plat in their appendix, which we reproduce here solely to provide context:



The R2 lots the property at issue here are outlined in red, the floodways are outlined in blue, and a jogging path is marked in green. The residential lots belonging to the appellants abut the R2 lots along the eastern and southern parts of the development.

After the City built a bridge over the creek to connect the property at issue to a public park, the appellants sued their homeowners' association (HOA) and the City, seeking a declaratory judgment that the HOA owned the property and seeking to quiet title to the property.[2] They also brought against the City a claim for trespass, for breach of restrictive covenants, and for inverse condemnation. And, at issue here, they sought injunctive relief to stop the public from using the bridge both in the interim and permanently.

[2]   The appellants sued the City before the bridge opened in January 2014, arguing that the lots had been conveyed to the HOA as part of the "Common

Properties" by dedication in a declaration instead of to the City by deed. The appellants sued the HOA for breach of contract and for breach of the duty to act in good faith, with ordinary care, and in the best interest of the HOA members.

In their application for injunctive relief, the appellants asked the trial court to order the following:

1. That the City, City Officials and/or Mansfield Corp. shall immediately place a temporary barricade on the Walnut Creek Bridge that will prevent and/or deter access to the Estates of Creekwood by the general public.

   **\*436**  2. That the City, City Officials and/or Mansfield Corp. shall be immediately prohibited from entering, or encouraging others to enter, the Estates of Creekwood.

3. That the City, City Officials and/or Mansfield Corp. place a valid and legally enforceable "no trespassing" sign on the barricade that will be enforceable by the City of Mansfield Police Department.

### III. Discussion

The appellants argue that the trial court abused its discretion by denying the temporary injunction because they established their right to seek injunctive relief in the form of valid causes of action against the City trespass and breach of restrictive covenants. They also contend that they established a probable right to relief and will suffer probable and irreparable injury absent a temporary injunction. *See Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002) (op. on reh'g) (establishing that to obtain a temporary injunction, the applicant must plead and prove a cause of action against the defendant; a probable right to the relief sought; and a probable, imminent, and irreparable injury in the interim). The City points out that the appellants' causes of action are predicated on their underlying assertion that the HOA owns the lots and that because their underlying assertion is incorrect, the trial court could not have abused its discretion by denying the injunction.

### A. Relief Sought

[1]    [2] The appellants sought both prohibitive and mandatory temporary injunctions. A prohibitive

injunction forbids conduct, while a mandatory injunction requires it. *Lifeguard Benefit Servs., Inc. v. Direct Med. Network Solutions, Inc.,* 308 S.W.3d 102, 112 (Tex.App.–Fort Worth 2010, no pet.) (citing *RP & R, Inc. v. Territo,* 32 S.W.3d 396, 400 (Tex.App.–Houston [14th Dist.] 2000, no pet.)). A mandatory injunction is proper only when necessary to prevent irreparable injury or extreme hardship, *Iranian Muslim Org. v. City of San Antonio,* 615 S.W.2d 202, 208 (Tex.1981); *see Lifeguard,* 308 S.W.3d at 112, and it should be denied absent a clear and compelling presentation of such extreme necessity or hardship. *RP & R, Inc.,* 32 S.W.3d at 400–01.

The appellants asked the trial court to make the City put a temporary barricade and "no trespassing" signs on the bridge. These requests, if granted, would have required the City to take action through the expenditure of taxpayer dollars and use of police enforcement. Therefore, they are mandatory injunctions. [3]

[3]  While the dissent concludes that these are "merely incidental" to the primary relief requested, the prohibition on entry by the City or its encouragement to others to enter the property was tangential to these mandatory requests, and not the other way around. That is, the way the City would comply with the prohibitive injunction of not encouraging entry would be by erecting the barricade, placing a "no trespassing" sign on the barricade, and using the police department to enforce the sign.

### 1. Evidence

Michael Goodrich, an attorney board-certified in commercial real estate law, testified on behalf of the appellants at the injunction hearing. He stated that when he inspected the neighborhood, he walked the entire jogging trail. There was a portion of the trail that could be accessed outside of the gated community even without using the City's bridge. He said that the access point, through another neighborhood, was "a pretty good distance" from the bridge and was a very narrow entrance.

Kelli Savering, one of the appellants, testified that when she bought her home in April 2011, she believed that the neighborhood was gated based on what her real estate agent told her. She saw gates when she toured the property and understood that the gates' purpose was for security and privacy. Savering said that she was not told

at that time that the land behind **\*437** her house was a public park, did not learn about the bridge construction project until May 2013, and said that she would not have purchased the home if she had known there would be a public park behind it. Savering stated that she and the other adjoining homeowners had always taken care of maintaining the property at issue, mowing the grass and picking up any debris. Before the bridge was opened, the flow of traffic onto the property at issue was very minimal.

Savering testified that during the last ten months after the bridge opened, she had seen people fishing in the private lake, taking photos, picnicking on the property at issue, and using small motor vehicles on it. During nice weather, the property drew 25 to 100 people on weekdays and 100 to 250 on weekends. This concerned her because her neighborhood was no longer secure, and she was concerned about safety. She had a swimming pool in her backyard, and the public could see her and her family use the pool and their backyard, destroying her sense of privacy. No fence separated the public from the private lake because it was a floodway. Savering said that the Mansfield Parks Department had put up a few signs to keep the public off of her property and away from the lake but that the signs had not been effective.

During cross-examination, Savering said that of the 25 people on average that cross the bridge in a week, "[t]here's probably one or two a week" that go onto the homeowners' private property. The only damage she was aware of was the public's fishing and the trash that residents had had to pick up. She acknowledged having known about the Walnut Creek Linear Trail Project but said that she "didn't know it was going to come in [her] backyard," even though she knew Walnut Creek ran along the rear of her property. Savering also acknowledged never having looked at her property's restrictive covenants to determine the type of security the covenants provided regarding pedestrian access to the neighborhood, although she was provided with a copy of the restrictive covenants at the time that she bought the property. Savering admitted that she had known there was an entryway to the trail that led along the creek area that had been there since she purchased the property. She testified during her direct examination that the access point was through a nearby neighborhood, between two homes, and that to her knowledge, only the people in that neighborhood had used the access point before January 2014, resulting in very minimal foot traffic.

Savering stated that while her swimming pool was not directly adjacent to the trail, the lake was, and she claimed that she owned the lake along with seven other homeowners in the neighborhood. Savering said that her only personal damage was the loss of privacy in her backyard, some lost tax value on her home, and the loss of her expectation of safety, which she said would be impossible to quantify.

Brian Brandstetter, an attorney who had lived in the neighborhood since 1996 and was a member of the HOA's board of directors, testified that the board of directors had determined that the property at issue did not belong to the HOA. Brandstetter stated that when he moved into the neighborhood in 1996, the trail, which he referred to as a jogging path, already existed on the property at issue.

### 2. Analysis

[3] The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003). And an abuse of discretion does not occur when the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa,* 299 S.W.3d 92, 97 (Tex.2009); *Butnaru,* 84 S.W.3d at 211. The trial court had the discretion to believe or disbelieve any of the testimony, to determine that the additional **\*438** pedestrian access provided by the bridge —when the neighborhood already had a pedestrian access point that Savering was aware of when she bought her home—did not constitute irreparable injury or extreme hardship, and to conclude that the appellants had not made a clear and compelling presentation of extreme necessity or hardship. *See RP & R, Inc.,* 32 S.W.3d at 400. Therefore, the trial court did not abuse its discretion by denying the requested mandatory injunctive relief.

### B. Trespass

[4] [5] [6] Notwithstanding the proper denial of the requested mandatory injunctive relief, the appellants argue that a probable, immediate, and irreparable injury should be presumed based on their trespass claim. A trespass-to-real-property claim requires a plaintiff to prove that he owns or has a lawful right to possess real property, that the defendant physically, intentionally, and voluntarily entered his land (or intentionally caused a third person to enter the land), and that the defendant's trespass caused injury to the plaintiff. *Wilen v. Falkenstein,* 191 S.W.3d 791, 797–98 (Tex.App.–Fort Worth 2006, pet. denied). When a trespass invades the possession of a person's land, or destroys the use and enjoyment of that land, an injunction is a proper remedy. *Beathard Joint Venture v. W. Houston Airport Corp.,* 72 S.W.3d 426, 432 (Tex.App.–Texarkana 2002, no pet.) (citing *City of Arlington v. City of Fort Worth,* 873 S.W.2d 765, 769 (Tex.App.–Fort Worth 1994, writ dism'd w.o.j.)). An injunction is also a proper remedy to restrain repeated or continuing trespasses when the remedy at law is inadequate because of the injury's nature or the multiplicity of actions necessary to obtain redress; in such situations, the requirements of no adequate remedy at law and irreparable damage are satisfied. [4] *Id.*

[4] For example, when the *owner* of a development allows access to amenities to persons other than the owners of lots in the development in contravention of restrictive covenants on the property, there is no abuse of discretion when a trial court grants a permanent injunction to the lot owners. *Beathard Joint Venture,* 72 S.W.3d at 432 (discussing *Musgrave v. Brookhaven Lake Prop. Owners Ass'n,* 990 S.W.2d 386, 393 (Tex.App.–Texarkana 1999, pet. denied)).

[7] [8] But a cause of action for injury to real property belongs to the person who owns the property at the time of the alleged injury. *Vee Bar, Ltd. v. BP Amoco Corp.,* 361 S.W.3d 128, 132 (Tex.App.–El Paso 2011, no pet.). On December 11, 1995, the subdivision's developer filed a declaration containing the neighborhood's restrictive covenants and stating that the HOA *"will hold"* record fee simple title to the subdivision's streets and "all other Common Properties." [Emphasis added.] One day later, the articles of incorporation for the HOA were executed, and they were filed on December 15, 1995. Approximately one week later, on December 22, 1995, the developer executed a warranty deed conveying the property at issue not to the HOA, but instead, to the Communities Foundation of Texas. [5]

[5] The Communities Foundation of Texas executed a deed in 2012 conveying the property to the Mansfield Park Facilities Development Corporation.

[9] Even assuming that the declaration had attempted to convey the lots at issue to the HOA, the HOA did not exist when the declaration was filed, and a conveyance cannot be made to a nonexistent legal entity. *See Sparks v. Humble Oil & Ref. Co.,* 129 S.W.2d 468, 471 (Tex.Civ.App.–Texarkana 1939, writ ref'd) (" 'It is a well-established rule that a deed can be made only to grantees in existence or life, at the time of **\*439** the execution of the deed.' " (quoting *Vineyard v. Heard,* 167 S.W. 22, 25–26 (Tex.Civ.App.–San Antonio 1914), *aff'd,* 212 S.W. 489 (Tex.Comm'n App.1919, judgm't adopted)); *see also Parham Family Ltd. P'ship v. Morgan,* 434 S.W.3d 774, 787 (Tex.App.–Houston [14th Dist.] 2014, no pet.) (" '[I]n Texas, a deed is void if the grantee is not in existence at the time the deed is executed.' " (quoting *Lighthouse Church of Cloverleaf v. Tex. Bank,* 889 S.W.2d 595, 600 (Tex.App.–Houston [14th Dist.] 1994, writ denied) (op. on reh'g))). [6]

[6] In *Parham,* the entity never came into existence, and the deed was held void. 434 S.W.3d at 787–88. But even in cases where the entity was later created, the result is the same. *William Cameron & Co. v. Trueheart,* 165 S.W. 58, 61 (Tex.Civ.App.–Austin 1914, no writ) (relying on the law that "[a] deed will not pass title to a grantee not in existence," and holding that since the conveyance "was made before the [company's] charter ... was issued," the deed would not pass title to the corporation).

In *Lighthouse,* the court allowed conveyance to a corporation whose charter had been forfeited due to nonpayment of franchise taxes. 889 S.W.2d at 601. But it did so only by holding that the corporation was still in existence at the time the deed purported to convey that property because it was still legally operating during a statutory window of time when its charter could be reinstated through payment of delinquent taxes. *Id.* (holding that because "[f]orfeiture of a corporate charter does not extinguish the corporation as a legal entity so long as there is a statutory right to have the corporate charter reinstated," the corporation "was not wholly extinguished as a legal entity," and, thus, it had "sufficient legal existence *at the time the deed was executed* to be a grantee") (emphasis added).

On this record, by filing the declaration a day before the articles of incorporation were executed and four days before they were filed, even if the developer had intended to convey the property to the HOA, the attempted conveyance was a day late and a dollar short. Therefore,

the trial court could have found that the lots at issue had never belonged to the HOA and that even if an injury could be presumed based on the trespass claim, the appellants did not prove standing to make that claim with regard to the lots at issue. Therefore, the trial court's order denying the application is also affirmed on this basis. [7]

[7] Although the appellants ask that we construe the declaration, in light of the fact that the HOA had not yet been created at the time of the declaration, this is not an issue that we need to reach. *See* Tex. R. App. P. 47.1. However, even if we did construe the declaration, to embrace the appellants' interpretation would require us to ignore section 10.02's allocation to the HOA's board of directors of the "right, power and authority to determine all questions arising under or in connection with this Declaration and to construe and interpret the provisions thereof." Section 10.02 provides that any determination, construction, or interpretation made by the board of directors, "in the absence of an adjudication by a court of competent jurisdiction *that any such action was an abuse of discretion,* shall be binding on the Owners." [Emphasis added.] No such adjudication has occurred with regard to whether the board of directors *abused its discretion* by agreeing with the City that the property at issue does not belong to the HOA. The requirement that an abuse of discretion be proved makes sense in light of the circumstances of this case. Certainly before a third party may thrust the burdens of real estate ownership upon the HOA—including the obligation for payment of taxes, liability insurance premiums, and upkeep and maintenance services—the HOA should be afforded the right to determine in the first place whether it asserts any ownership interest in the property.

## C. Restrictive Covenants

The appellants alternatively argue that even if the City owns the property at issue, they still had a probable right to injunctive relief because the City breached the neighborhood's restrictive covenants, which they claim clearly prohibited converting the property at issue into a public park. In their fourth amended original petition, they contended that the City's deed stated that the conveyance was made and accepted subject to the recorded restrictive covenants and that the declaration, which contained the restrictive covenants, showed **\*440** that the developer intended the neighborhood to be gated and private. But they also contended in the petition that

the City violated the restrictive covenants by inviting the general public to use the "HOA's properties." As set out above, the HOA determined that it did not own the property at issue, and whether the HOA abused its discretion in making this determination has yet to be adjudicated. And the trial court could have found, as set out above in our discussion of the testimony at the temporary injunction hearing, that the appellants did not prove a probable, imminent, and irreparable injury in the interim. *See Butnaru,* 84 S.W.3d at 204. Therefore, we need not reach the merits of this issue. *See* Tex. R. App. P. 47.1.

### IV. Conclusion

For these reasons, we affirm the trial court's order denying temporary injunctive relief.

MEIER, J., filed a dissenting opinion.

BILL MEIER, JUSTICE, dissenting

The majority misidentifies the type of injunctive relief sought by Appellants, erroneously concludes that the HOA was incapable of owning the R2 lots when the Declaration was filed, and misconstrues a Declaration provision that is no impediment to Appellants' application for temporary injunctive relief. Because I disagree with this analysis, and because Appellants are otherwise entitled to temporary injunctive relief, I dissent.

### I. TYPE OF INJUNCTIVE RELIEF

The majority reasons that Appellants must be seeking mandatory injunctive relief—and were therefore required to demonstrate extreme necessity or hardship—because they asked that a temporary barricade be placed on the bridge and that a "no trespassing" sign be placed on the barricade. *See Tri–Star Petroleum Co. v. Tipperary Corp.,* 101 S.W.3d 583, 592 (Tex.App.–El Paso 2003, pet. denied) (reasoning that mandatory injunction requires showing of "a clear and compelling presentation of extreme necessity or hardship"). But Appellants also requested that the trial court enjoin the City from permitting the public, or encouraging others, to enter the R2 lots by crossing over the bridge. Appellants' requested injunctive

relief thus contains elements of *both* a mandatory and prohibitive character. When identifying the type of injunction sought under these unique circumstances, a court should resort to the pleadings and examine the nature of the applicant's underlying claims to determine which element of injunctive relief is merely incidental to the primary relief sought. *See id.* at 592–93.

In this case, Appellants sued the City because it had built a bridge onto property that is allegedly owned by a different entity, leading to a sharp increase in the number of nonresidents who utilize the R2 lots for recreation, leading to a decrease in Appellants' privacy and safety. These are the primary motivating factors in Appellants' decision to pursue this litigation. There can be no doubt, therefore, that the primary injunctive relief sought by Appellants is to prohibit the City from permitting the public, or encouraging others, to enter the R2 lots by crossing over the bridge. Sure, placing a barricade and sign are mandatory-type requests, but they are merely incidental to Appellants' primary relief because without them, nothing would notify the public that crossing over the bridge and onto the R2 lots is prohibited, thus rendering the primary, prohibitive injunctive relief unenforceable, meaningless, or both. I would hold that Appellants seek a prohibitive temporary injunction, and I would not require Appellants to demonstrate extreme hardship or necessity.

### *441 II. EXISTENCE OF THE HOA

Relying on the rule that "a deed is void if the grantee is not in existence at the time the deed is executed," *Parham Family Ltd. P'ship v. Morgan,* 434 S.W.3d 774, 787 (Tex.App.–Houston [14th Dist] 2014, no pet.), the majority alternatively reasons that Appellants failed to establish a right to injunctive relief based on their trespass claim because the HOA "did not exist when the Declaration was filed." The rule is certainly worded broadly, but it has never been applied to facts that are anything like those in this case, as the caselaw cited by both the City and the majority reflects. In *Parham,* the grantee-entity never existed. *Id.* at 777, 787. In *Lighthouse Church of Cloverleaf v. Texas Bank,* the grantee had a statutory right to reinstate its corporate charter after it had been forfeited. 889 S.W.2d 595, 599–601 (Tex.App.–Houston [14th Dist.] 1994, writ denied). In *William Cameron & Co. v. Trueheart,* the deed conveyed land to individuals, not to a yet-to-be-created entity. 165 S.W. 58,

61 (Tex.Civ.App.–Austin 1914, no writ). And in *Sparks v. Humble Oil & Refining Co.,* a deed evidenced a legal conveyance even though it was signed and acknowledged by one of the grantors after the grantee's death. 129 S.W.2d 468, 471–72 (Tex.Civ.App.–Texarkana 1939, writ ref'd).

In this case, the Joint Venture executed the Declaration on December 6, 1995, the very same day that the incorporator created the document pursuant to which the HOA's Articles of Incorporation were drafted. The Declaration became effective upon its filing on December 11, 1995, just one day before the Articles of Incorporation were executed and four days before they were filed. Robert McCaslin signed the Declaration as Managing Partner of the Joint Venture, and the Articles of Incorporation identify him as the lone initial member of the HOA's Board. The HOA's Articles of Incorporation were filed before the Joint Venture executed the deed to the Foundation.

As the record shows, this is not a case in which the HOA's Articles of Incorporation were filed weeks, months, or years after the Declaration was filed, or were not even filed at all. The record plainly demonstrates that all of these events occurred contemporaneously and involved the same individuals. By treating the HOA as a nonexistent entity that was incapable of owning the R2 lots, the majority ignores the realities associated with the complicated process of formalizing a development and improperly resolves this challenging case upon a hypertechnical reading of the grantee-existence rule. [1]

[1] The City argues that the HOA could not own the R2 lots because the HOA's Articles of Incorporation "do not express any intent that the [HOA] actually own any real property." However, the Articles of Incorporation provide that the purpose for organizing the HOA is "[t]o define and enforce the Deed Restrictions of [Creekwood] *and carry out the duties authorized therein."* [Emphasis added.] The Declaration expressly gives the HOA the right, power, and duty to own fee simple title in the Common Properties. The HOA's ownership of the R2 lots is therefore not inconsistent with the purpose of the Articles of Incorporation.

### III. STANDING

The majority alternatively points out in its footnote six that Appellants' interpretation of the Declaration is inconsistent with section 10.02. Similarly, the City argues that Appellants lack standing to challenge the HOA Board's Declaration-derived determination that it does not own the R2 lots. Section 10.02 states in relevant part,

> The Board shall have the right, power and authority to determine all questions arising under or in connection with this Declaration and to construe and interpret the provisions thereof, and any determination, construction or interpretation made by the Board, in the absence of an adjudication by a court of competent jurisdiction that any such action was an abuse of discretion, shall be binding on the Owners.

***442** According to the City, Appellants "manifestly do not have the right to interpret the provisions of the Declaration, and that is precisely what they are attempting to do by this action."

Appellants rely on Declaration section 10.04 and respond that they have standing to seek injunctive relief both in contract and by law. Section 10.04 states in relevant part,

> Declarant, the [HOA], and *the Owners shall have the right, but not the obligation, to enforce the covenants and restrictions set out in this Declaration.* Enforcement may be made by any proceedings at law or in equity against any Person violating or attempting to violate any part of this Declaration, as such may be amended or modified, to restrain or enjoin violations thereof, to recover damages, or to seek such other relief available pursuant to applicable law. Damages shall not be deemed adequate compensation for any breach or violation of any provision of this Declaration, and Declarant, the [HOA], and *each Owner ... shall be entitled to relief by way of injunction, as well as any other*

*remedy either at law or in equity.*
[Emphasis added.]

I would hold that Appellants are proceeding within the terms of the Declaration. Section 10.02 certainly gives the HOA the authority to interpret the Declaration, but the HOA's interpretation is binding only "in the absence of final adjudication by a court of competent jurisdiction" that concludes otherwise. Section 10.02 thus contemplates (i) a scenario in which a homeowner's interpretation of the Declaration is at odds with the HOA's interpretation of the Declaration and (ii) that homeowner-initiated litigation successfully challenging the HOA's interpretation of the Declaration will avoid the binding effect thereof. Section 10.04, which is located in the very same article as section 10.02, expressly gives a homeowner the right alluded to by section 10.02—the right to enforce the provisions of the Declaration, which action may or may not involve challenging an HOA interpretation of the Declaration.

Here, Appellants sued the City in a court of competent jurisdiction, and each of their trespass, suit to quiet title, trespass to quiet title, declaratory judgment, and inverse condemnation claims challenge or implicate the HOA's interpretation of the Declaration that the HOA does not own the R2 lots. By pursuing such relief, Appellants are in effect seeking—even if indirectly—an adjudication that the HOA's interpretation of the Declaration that the HOA does not own the R2 lots is erroneous. Further, nothing in either section 10.02 or section 10.04, or in Article X, conditions Appellants' ability to file suit and seek this temporary injunctive relief upon only a *prior* adjudication of the HOA's Declaration interpretation. Giving effect to all of section 10.02, reconciling it with section 10.04, and considering the nature of, and the relief sought by, Appellants' claims, section 10.02 is no impediment to Appellants' application for temporary injunctive relief. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003) (reasoning that when construing written agreement, no single provision taken alone will be given controlling effect and that all provisions must be considered with reference to whole instrument).

## *443 IV. APPELLANTS ARE ENTITLED TO TEMPORARY INJUNCTIVE RELIEF

Further, Appellants conclusively established a probable right to relief on their trespass claim and a probable, irreparable injury in the interim.

The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002). A temporary injunction is an extraordinary remedy and will not issue as a matter of right. *Id.* To obtain a temporary injunction, an applicant must plead and prove (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Id.* To establish a probable right to relief, a party is not required to prove that it will prevail at a final trial in order to invoke the trial court's discretion to grant a temporary injunction. *Oil Field Haulers Ass'n v. R.R. Comm'n*, 381 S.W.2d 183, 196 (Tex.1964). Rather, a probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it. *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 220 (Tex.App.–Fort Worth 2009, pet. denied), *cert. denied*, 559 U.S. 1036, 130 S.Ct. 2061, 176 L.Ed.2d 414 (2010).

Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Butnaru*, 84 S.W.3d at 204. A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex.2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex.2004).

Courts apply general rules of contract interpretation when construing a declaration of covenants. *See Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex.1998); *Harris Cty. Flood Control Dist. v. Glen brook Patio home Owners Ass'n*, 933 S.W.2d 570, 580 (Tex.App.–Houston [1st Dist.] 1996, writ denied). The primary duty is to ascertain the parties' objective intent from the language used in the entire instrument. *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 524–25 (Tex.1982); *Cooke v. Morrison*, 404 S.W.3d 100, 113 (Tex.App.–Houston [1st Dist.] 2013, no pet.). A court strives to harmonize and give effect to all the provisions so that none are rendered meaningless. *See J.M. Davidson*, 128 S.W.3d at 229.

### A. Probable Right to Relief—Trespass

Appellants argue in the first part of their only issue that they established a probable right to relief on their pleaded claim for trespass because the Joint Venture conveyed the Common Properties—which include the R2 lots—to the HOA by dedication in the Declaration before conveying the R2 lots by warranty deed to the Foundation. Because the December 11, 1995 dedication preceded the December 22, 1995 conveyance by deed, the Joint Venture held no title to the R2 lots to convey to the Foundation, and the City's actions on the R2 lots, including the construction of a bridge over Walnut Creek, constitute trespass, according to Appellants.[2] *See United Food & Commercial Workers Int'l Union v. Wal–Mart Stores, Inc.,* 430 S.W.3d 508, 512 (Tex.App.–Fort Worth 2014, no pet.) ("Trespass to real property requires a showing of an unauthorized physical entry onto the plaintiffs property by some person or thing.").

[2]   By pleading a cause of action for trespass, Appellants satisfied the first requirement for temporary injunctive relief. *See Butnaru,* 84 S.W.3d at 204.

**\*444** Relying upon a number of provisions contained in the Plat and the Declaration, the City responds that the Joint Venture did not intend to convey the R2 lots to the HOA through the Declaration. Therefore, according to the City, the Joint Venture's deeds legally transferred the R2 lots to the Foundation, which later transferred them to the Park Corporation, which owns them today.

The primary dispute between the parties thus centers on whether the Joint Venture intended to convey the R2 lots to the HOA by dedication in the Declaration. A proper application of the relevant rules of construction establishes that the Declaration conveyed the R2 lots to the HOA.

### 1. Public Recreation Use

The City argues that the Joint Venture could not have intended to convey the R2 lots to the HOA because the Joint Venture's "clear and express intent was to exclude the R2 lots from the Declaration, and instead to designate them for 'public recreation use.' " As support, the City observes that "the Declaration by its express terms affects only 'the Property' " and that the R2 lots were excluded from the Declaration's definition of that term.[3] The City improperly blurs the careful distinction that the

Declaration intentionally draws between the Property and the Common Properties. The definition of Property excludes the R2 lots, but it also does not include the Common Properties. The Declaration provides a separate, specific, and detailed definition of Common Properties, which includes the streets, any guardhouses, the entry areas, the improvements installed by the HOA, and the following:

> Any and all greenbelt areas, bicycle and/or jogging paths, landscape easements, floodways, creeks, drainage ways, open spaces, pedestrian access easement or other similar areas as shown on the Plat (as hereinafter defined) of the Subdivision, whether within or surrounding or along the boundaries of *the Property.* ... [Emphasis added.]

This distinct definition demonstrates that the Joint Venture intended to differentiate and segregate the Common Properties from the Property. Therefore, if the Declaration *included* the R2 lots in the Common Properties, as Appellants argue, then it follows that the Joint Venture purposefully *excluded* them from the definition of Property. Construing the Declaration as a whole, the R2 lots' exclusion from the definition of Property merely expresses the Joint Venture's intent to do just that—exclude the R2 lots from the definition of Property, not from the entire Declaration.

[3]   The Declaration states that "Property" "shall mean the real property situated in the City of Mansfield, Tarrant County, Texas, more particularly described on Exhibit 'A' attached hereto." The description includes the R1 lots (and several other numbered lots) but not the R2 lots.

The City next points to the Plat's first Condition for Approval, which states that the R2 lots "are inten[d]ed for public recreation use and shall not be converted to other uses. No building permits will be issued for any of said lots unless it is for construction related to public recreation use." The City contends that "[t]his restriction is directly contrary to the [Appellants'] suggestion that the [Joint Venture's] intent was to allow only private use of the R2 lots by the homeowners." The City also argues that the Joint Venture "was no longer free to convey the R2 lots to the HOA" once it filed the Plat containing the

first Condition of Approval because the Plat "set aside [the R2 lots] for the public's use." The former argument overlooks a crucial distinction; the latter misconstrues the Plat's first Condition. Appellants do not argue that the R2 lots were **\*445** intended for private use; they argue that the Joint Venture conveyed the R2 lots to the HOA by dedication in the Declaration. As for the Plat's first Condition, it does not prohibit *conveyance* of the R2 lots; it prohibits their *development* for nonrecreational uses. The Joint Venture's intent as expressed in the Plat's first Condition is not compromised by a mere conveyance of the R2 lots to the HOA. Further, there is nothing in the Declaration that somehow associates a conveyance of the R2 lots to the HOA with a Plat-prohibited development of the R2 lots for nonrecreational purposes.

As further evidence that the Joint Venture did not intend to convey the R2 lots to the HOA, or to demonstrate the Joint Venture's intent to set aside the R2 lots for public recreation use, the City asserts that there is no mention in either the Declaration or the Plat of the HOA having any maintenance responsibility for the R2 lots. However, Declaration section 9.04 unambiguously imposes the responsibility to maintain the Common Properties upon the HOA. Appellants argue that the Common Properties include the R2 lots, and I would conclude that they do, so section 9.04 is sufficient to account for the R2 lots' maintenance.

### 2. Declaration's Conveyance of Common Properties to HOA

For the HOA to own the R2 lots, the Declaration must have conveyed the Common Properties to the HOA. Appellants argue that the Declaration did so. The City argues that the Declaration did not do so. Declaration section 5.01 states as follows:

> 5.01 *Title to the Common Properties. The [HOA] will hold record fee simple title to the Streets and all other Common Properties, and all portions of the Property which are not within any of the Lots as shown on the Plat, all of which have been or will be dedicated to the [HOA] as shown on and pursuant to, the Plat,* subject to the easements set forth

is this Article and in Article VIII hereof. Declarant or the [HOA] shall have the right to execute any open space declarations applicable to the Common Properties owned by, or dedicated to, the Association which may be permitted by law in order to reduce property taxes. [Emphasis added.]

Appellants argue that the Declaration intended section 5.01 to affect a present transfer of the Common Properties. The City argues that the Joint Venture did not intend section 5.01 as a present conveyance because "will hold" indicates a future tense and "have been or will be" are terms signifying either past or future actions. According to the City, "any conveyance to the HOA was to occur before or after the filing of the Declaration, not by the Declaration." The City's construction is faulty.

I agree with Appellants that "the word 'will' does not always refer to a future event; it is an ordinary word of promise that may be used to create a contractual obligation." *See* Webster's Third New Int'l Dictionary 2616 (2002). Thus, whether the Joint Venture intended "will hold" to refer to a future event depends on how, and in what context, the term is used. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex.2003) (reasoning that contract provisions should be read in context, not in isolation). The City argues that the latter part of section 5.01's first sentence—"will be dedicated to the [HOA]"—demonstrates that "will hold" means a future event, but that argument is itself predicated upon a defective reading of section 5.01. Specifically, the City construes section 5.01 as providing that "[t]he [HOA] will hold record fee simple title to the Streets and all other Common Properties, ... all of which have been or will be **\*446** dedicated to the Association as shown on and pursuant to, the Plat." But section 5.01 is more properly read as providing that the HOA will hold fee simple title to (1) the Streets, (2) the Common Properties, and (3) "all portions of the Property which are not within any of the Lots as shown on the Plat, all of which have been or will be dedicated to the Association as shown on and pursuant to, the Plat." *See Samano v. Sun Oil Co.*, 621 S.W.2d 580, 581–82 (Tex.1981) (stating that "modifiers are intended to refer to the words closest to them in the sentence"); *see also Lockhart v. United States*, ——U.S. ——, 136 S.Ct. 958, 962–63, 194 L.Ed.2d 48 (2016) (explaining that last antecedent rule has been applied for many years). The

last antecedent rule "can be overcome by indicia of other meaning," but this construction is supported by several other sections in the Declaration. *Mikob Props., Inc. v. Joachim,* 468 S.W.3d 587, 596 (Tex.App.–Dallas 2015, pet. denied).

Section 6.01(q) provides that the HOA's Board "shall have" the exclusive right, power, and duty "[t]o own fee simple title, or an easement interest, in the Common Properties." Section 6.01(q) thus gives the HOA the express authority to own the Common Properties, and section 5.01 simultaneously carried out the Declaration's conveyance.

Declaration section 4.10 gives the City the right to assume the HOA's obligation to maintain the Common Properties if the HOA dissolves *and* the Common Properties are not either "dedicated to and accepted by an appropriate municipal corporation, public agency, authority or utility" or "conveyed to another organization or entity which assumes all obligations imposed hereunder upon the" HOA. Thus, the HOA's dissolution is a predicate occurrence for either a dedication or a conveyance of the Common Properties.

Further, section 6.01(k) gives the HOA's Board the power to "protect or defend the Common Properties from loss or damage by suit or otherwise"; section 6.01 (*l*) gives the HOA's Board the power to "make reasonable rules and regulations for the operation and use of the Common Properties"; section 4.02 requires homeowners to pay assessments to the HOA for the improvement and maintenance of the Common Properties; and section 9.04 imposes the responsibility to maintain the Common Properties upon the HOA, something it has done in part for years. While none of these provisions considered in isolation are determinative, considered together, they are indicative of the Joint Venture's intent to convey the Common Properties to the HOA.[4]

[4]     Arguing that section 5.01 is "erroneous," the City contends that the phrase "all portions of the Property which are not within any of the Lots as shown on the Plat" is surplusage because no portion of the Property lies outside of the lots. The argument is unpersuasive in light of the last antecedent rule.

The City alternatively argues that the terms "as shown on and pursuant to the Plat" "clearly indicate that the Plat, not the Declaration, was intended as a conveyance."

According to the City, "[n]o conveyance by the [Joint Venture] of the private streets and private easements, whether by deed or through the Declaration, was necessary because the private streets and easements had already been conveyed through the Plat." However, as explained immediately above, the terms "as shown on and pursuant to the Plat" modify "all portions of the Property which are not within any of the Lots as shown on the Plat," not the Common Properties. Moreover, it cannot be ignored that the Joint Venture separately identified the Common Properties and "all portions of the Property which are not within any of the Lots as shown on the Plat," purportedly indicating **\*447** that they are not identical forms of property. Thus, there is no conflict in construing the Declaration to convey the Common Properties but reading the Plat to convey "all portions of the Property which are not within any of the Lots as shown on the Plat."

Finally, referencing the Plat, the City argues that "rather than dedicating or conveying fee title to the private common property, the [Joint Venture] conveyed easement interests only." If this is an accurate interpretation of the Plat, then it supports Appellants' argument that the Declaration was free to convey fee title to the R2 lots to the HOA.

I would hold that the Joint Venture intended to convey the Common Properties to the HOA by dedication in the Declaration.

### 3. R2 Lots Included in Definition of Common Properties

The City next argues that even if the Declaration conveyed the Common Properties to the HOA, the Common Properties do not include the R2 lots. However, as set out above, Article I, subparagraph (k)(ii) of the Declaration defines Common Properties to mean all *"greenbelt areas, bicycle and/or jogging paths,* landscape easements, *floodways,* creeks, drainage ways, *open spaces,* pedestrian access easement *or other similar areas* as shown on the Plat whether within *or surrounding or along the boundaries of the Property."* [Emphasis added.] Michael Goodrich testified at the hearing on Appellants' amended application, and the record reflects, that several items included in the definition—the greenbelt areas, bicycle and jogging paths, and floodways—correspond to areas that are located within, or that entirely encompass, the R2 lots. Indeed, the jogging path is located in the R2

lots, the floodways completely encompass the R2 lots, and Walnut Creek and its trees and grass border Creekwood's northern and western boundaries. Moreover, the R2 lots—which are undeveloped, open spaces—surround or run along the boundaries of the Property.[5] Goodrich consequently opined, and I agree, that these numerous items contained in the definition of Common Properties are not boilerplate but were "clearly tailored" for this particular development.

[5] The City argues that this language—"within or surrounding or along the boundaries of the boundaries of the Property"—"could easily have been either intended to simply cover any strips or gores that were excluded, or perhaps it was inadvertently held over from a prior draft of the Declaration before the R2 lots were carved out of the R1 lots." This argument is based on speculation, not the language contained in the Declaration.

The City acknowledges that the definition of Common Properties "arguably could include portions of the R2 lots," but it nevertheless contends that the Joint Venture did not intend to include the R2 lots in the definition of Common Properties because the R2 lots are excluded from the terms "Property" and "Subdivision."[6] This is a slight variation of the same unpersuasive argument above. For the same reasons, the R2 lots' exclusion from the terms "Property" and "Subdivision" does not evidence the Joint Venture's intent to exclude the R2 lots from the meaning of Common Properties.

[6] The Declaration defines "Subdivision" as "the Property as shown on the Plat, to be commonly known as The Arbors of Creekwood—Gated Community.' "

**\*448** The City also points to the definitions of "Lot" or "Lots" and "Total Lots," all of which expressly exclude from their meaning any lots "shown on the Plat as intended for public recreation use or public park purposes," and argues that this demonstrates the Joint Venture's intent to limit the scope of the Declaration because the Plat's first Condition designated the R2 lots for public recreation use. Once again, the Plat's first Condition prohibits the R2 lots' development for nonrecreational use; it does not prohibit the R2 lots from being conveyed to the HOA, nor is the Declaration incompatible with a conveyance of the R2 lots to the HOA.[7]

[7] The City observes a potential conflict between the boundaries of the R1 residential lots, which partially lie within the floodways, and the definition of Common Properties, which expressly includes the floodways. If this is a conflict between the Plat and the Declaration, it did not arise as a result of this litigation, and our court has no ability, authority, or responsibility to re-write the terms of the documents.

In a related argument, the City asserts that the Plat's first Condition designating the R2 lots for public recreation use, which is specific, controls over the Declaration's definition of Common Properties, which is more general. The rule of contract construction that the City seeks to apply is inapposite because, as explained, the Plat's first Condition of Approval does not conflict with the definition of Common Properties. *See Sefzik v. Mady Dev., L.P.,* 231 S.W.3d 456, 462 (Tex.App.–Dallas 2007, no pet.) (stating that specific-controls-over-general rule applies when contract provisions conflict).

I agree with Appellants that the R2 lots are included within the definition of Common Properties.

### 4. Statute of Frauds

The City alternatively argues that even if Declaration section 5.01 were intended as a present conveyance of the R2 lots, it violates the statute of frauds because the definition of Common Properties contained in Article I, subparagraph (k)(ii), and set out above, "is too vague to identify the property described."

An instrument that conveys land must contain a sufficient legal description, or it is void under the statute of frauds. *Greer v. Greer,* 144 Tex. 528, 530, 191 S.W.2d 848, 849 (1946). "A property description is sufficient if the writing furnishes within itself, or by reference to some other existing writing, the means or data by which the particular land to be conveyed may be identified with reasonable certainty." *AIC Mgmt. v. Crews,* 246 S.W.3d 640, 645 (Tex.2008). In other words, "[i]f enough appears in the description so that a party familiar with the locality can identify the premises with reasonable certainty, it will be sufficient." *Gates v. Asher,* 154 Tex. 538, 541, 280 S.W.2d 247, 248–49 (1955). The writing does not have to list metes and bounds to be enforceable. *Nguyen v. Yovan,* 317 S.W.3d 261, 267 (Tex.App.–Houston [1st Dist.] 2009,

pet. denied). Extrinsic evidence may be used "only for the purpose of identifying [the property] with reasonable certainty from the data" contained in the conveying instrument, "not for the purpose of supplying the location or description of the" property. *Morrow v. Shotwell,* 477 S.W.2d 538, 541 (Tex.1972).

The City argues that the definition of Common Properties is not sufficiently specific because it does not identify the R2 lots "by tract survey and county" or contain information regarding their "size, shape, and boundaries." The test for sufficient **\*449** specificity does not require mathematical certainty. *See Gates,* 154 Tex. at 542, 280 S.W.2d at 249. Although certain cases may require a survey and county identification, this is not one of them. As explained above, several items included in the definition of Common Properties correspond to, and specifically identify, areas that are actually located within, or that entirely encompass, the R2 lots. The language is not merely boilerplate, and there is no dispute that the language references property that is contained within Creekwood.

The City contends that the phrase "as shown on the Plat ... of the Subdivision" is of no help because the Plat does not show the location of the greenbelt areas or jogging paths. But the Plat identifies Walnut Creek's location and the floodways, and according to Goodrich, considering the Declaration's Article I, subparagraph (k)(ii) and the Plat, and having seen the property, "all those taken together, you can identify [the greenbelt areas] clearly." Moreover, in *Templeton v. Dreiss,* the court of appeals explained,

> [W]here a map, plat, plan or survey of the premises conveyed is adequately referred to [in the] deed, it is usually to be considered as a part of the latter instrument and construed in connection therewith and the courses, distances, or other particulars which appear on such map, plat, plan or survey, are as a general rule to be considered as the true, or part of the true, description of the land conveyed.

961 S.W.2d 645, 660 (Tex.App.–San Antonio 1998, pet. denied) (*citing Pritchard v. Burnside,* 140 Tex. 212, 167 S.W.2d 159, 162 (1943)). If this authority is still relevant to this inquiry, the Plat clearly identifies the R2 lots.

The City also argues that the definition of Common Properties references a plat that is incapable of being identified because "Plat" is defined by the Declaration to mean "the final plats of The Arbors of Creekwood —Gated Community," but there is no plat on file in Tarrant County that is designated as a plat of "The Arbors of Creekwood—Gated Community." Both parties repeatedly cite to and rely upon the same plat that was entered into evidence at the hearing on Appellants' amended application for a temporary injunction—the one identified as "Plat Revision, Lots 52–R1, through ... 71–R2, Arbors of Creekwood Phase Two and Five." Referencing that plat, at the hearing on Appellant's application, the City acknowledged during its closing argument that "[w]e all believe we have the correct plat in front of us." Although the Declaration's definition of "Plat" references an incorrect plat, the definition of "Property," which is described in Exhibit A to the Declaration, references the "Arbors of Creekwood Phase Two and Five" plat. Liberally construing the Declaration to give effect to its purpose and intent, the Declaration properly refers to the plat that is referenced in the definition of "Property." *See Leake v. Campbell,* 352 S.W.3d 180, 184 (Tex.App.–Fort Worth 2011, no pet.).

I would conclude that the Declaration describes the Common Properties with reasonable certainty. *See Gates,* 154 Tex. at 541, 280 S.W.2d at 248–49.

### 5. Ambiguity

In the City's final alternative argument, it contends that "[i]f there is any question as to whether the Declaration was intended as a conveyance, the provisions of the Declaration are ambiguous because the language is subject to two or more interpretations."

**\*450** If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995). A contract is not ambiguous simply because the parties disagree over its meaning. *Dynegy Midstream Svcs., Ltd. v. Apache Corp.,* 294 S.W.3d 164, 168 (Tex.2009).

In light of all of the above, the Joint Venture unambiguously intended to convey the R2 lots to the

HOA by dedication in the Declaration. I would therefore decline to consider the City's extrinsic evidence for purposes of determining whether the Joint Venture intended such a conveyance. *See R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 519 (Tex.1980) ("If after applying the established rules of interpretation, a written instrument remains reasonably susceptible to more than one meaning, extraneous evidence is admissible to determine the true meaning of the instrument.").

Because the Joint Venture intended to convey the R2 lots to the HOA through a dedication in the Declaration, and because the effective date of the Declaration preceded the Joint Venture's deed to the Foundation, I would hold that Appellants established a probable right to relief on their trespass claim. *See Oil Field Haulers Ass'n,* 381 S.W.2d at 196; *Frequent Flyer Depot,* 281 S.W.3d at 220.

### B. Probable Injury

In the other part of their only issue, Appellants argue that they met their burden to show that a probable, irreparable injury will result before trial absent a temporary injunction. Probable injury includes the elements of imminent harm, irreparable injury, and no adequate remedy at law. *Shor v. Pelican Oil & Gas Mgmt., LLC,* 405 S.W.3d 737, 750 (Tex.App.–Houston [1st Dist.] 2013, no pet.). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru,* 84 S.W.3d at 204.

Appellants pleaded that the Park Corporation, in conjunction with the City, constructed and affixed a permanent structure on property that it does not own —the R2 lots. The City argues that damages would be sufficient to redress Appellants' alleged injury for trespass, but this ignores the very reason why Appellants initiated this lawsuit. The evidence at the hearing on Appellants' amended application demonstrates that the construction and opening of the bridge has led to a dramatic increase in the number of people accessing the R2 lots on both weekdays and weekends, destroying Appellants' sense of privacy. Where a trespass invades the possession of a person's land, or destroys the use and enjoyment of the land, an injunction is a proper remedy. *Beathard Joint Venture v. W. Houston Airport Corp.,* 72 S.W.3d 426, 432 (Tex.App.–Texarkana 2002, no pet.); *see Yarto v. Gilliland,* 287 S.W.3d 83, 97 (Tex.App.–Corpus Christi 2009, no pet.) (holding that the potential loss of rights in real property is a probable, imminent, and irreparable injury that qualifies a party for a temporary injunction); *Rus–Ann Dev., Inc. v. ECGC, Inc.,* 222 S.W.3d 921, 927 (Tex.App.–Tyler 2007, no pet.) (same); *see also Seghers v. Kormanik,* No. 03–13–00104–CV, 2013 WL 3336845, at *5 (Tex.App.–Austin June 26, 2013, no pet.) (mem.op.) (same). Appellants thus met their burden to show that a probable, irreparable injury will result before trial absent a temporary injunction.

### V. CONCLUSION

Appellants established a probable right to relief on their trespass claim and a probable, irreparable injury in the interim. I would therefore sustain Appellants' only issue and hold that the trial court abused its discretion by denying Appellants' amended application for a temporary injunction. Because the majority holds otherwise, I respectfully dissent.

**All Citations**

491 S.W.3d 433

---

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.